

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| PAMELA RANDEL, | ) |
| | ) |
| Respondent, | ) WD77211 Consolidated with |
| | ) WD77416 |
| v. | ) |
| | ) OPINION FILED: May 19, 2015 |
| CITY OF KANSAS CITY, MISSOURI, | ) |
| | ) |
| Appellant. | ) |

### Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Robert M. Schieber, Judge

Before Special Division: Cynthia L. Martin, Presiding Judge, Gary D. Witt, Judge and
Zel M. Fischer, Special Judge

The City of Kansas City ("the City") appeals from the trial court's judgment awarding Pamela Randel ("Randel") damages following a motorcycle accident on a state highway entrance ramp. Randel alleged that a hydraulic fluid spill from a Missouri Department of Transportation truck created a dangerous condition that the City failed to warn her about, proximately causing her injuries. Because Randel failed to prove that the dangerous condition was located on the City's property in the manner required to waive sovereign immunity, the trial court's judgment is reversed. Pursuant to our authority

under Rule 84.14 to "give such judgment as the court ought to give," we enter judgment in favor of the City.

## Factual and Procedural Background[1]

On April 9, 2011, a Missouri Department of Transportation ("MoDOT") truck began leaking hydraulic fluid on an exit ramp from eastbound Interstate 70 to Paseo Boulevard. The truck continued to leak as it traveled straight across and through two signaled intersections at the base of the ramp for southbound and northbound lanes of Paseo Boulevard and back up the entrance ramp for eastbound Interstate 70 where the truck pulled over to the side of the road.

Nearly three hours later, a motorcycle on which Randel was riding as a passenger crashed on the entrance ramp for eastbound Interstate 70 from Paseo Boulevard. Randel suffered serious injuries. At the time of the accident, no barricades prevented access to the entrance ramp, and Randel's husband, the operator of the motorcycle, saw no police officers or warnings about the spill. Randel's husband described the crash in a manner that suggested he unexpectedly encountered a slick spot on the entrance ramp as he began his acceleration to access the Interstate.

Randel filed suit against the Missouri State Highways and Transportation Commission ("the Commission") and the City.[2] The petition theorized premises liability

---

[1] We view the facts in the light most favorable to the jury's verdict. *Mengwasser v. Anthony Kempker Trucking, Inc.*, 312 S.W.3d 368, 370 n.1 (Mo. App. W.D. 2010).
[2] The petition also named John Doe Company as a defendant. Randel's petition alleged that an unnamed company was "engaged in the business of removing or making safe dangerous spills that occur on roadways and/or highways" and asserted that the unnamed company was negligent in that it did not promptly arrive to the scene to clean up the hydraulic fluid spill. Less than a week before trial, Randel and the Commission filed a stipulation for dismissal with prejudice. The stipulation provided that Randel was dismissing her claims against all defendants other than the City. Thus, only Randel's claim against the City remained at trial, a fact that was recognized by the

2

based on the dangerous condition of hydraulic fluid on the roadway and alleged that both public entities waived sovereign immunity pursuant to section 537.600.1(2).[3]

Prior to trial, Randel settled with the Commission. Her case proceeded to trial against the City. The uncontested evidence at trial established that the property where the hydraulic fluid spilled (the exit ramp, the entrance ramp, and the intersections between the two) was part of the state highway system owned by the Commission. Consistent with this fact, Randel never claimed that the City owned all or any part of the property where the hydraulic fluid spilled and instead claimed that the City assumed exclusive control and possession over the property after the spill occurred. On this point, Randel's evidence, viewed in the light most favorable to the verdict, established that the Kansas City, Missouri Police Department ("KCPD") responded to the scene of the spill before the accident and advised MoDOT personnel that they could leave. KCPD personnel thereafter conducted traffic control in the area while the spill was being remediated, but they failed to barricade the entrance ramp to Interstate 70 from Paseo Boulevard or otherwise warn of the spill on that ramp.

At the close of Randel's evidence, the City moved for a directed verdict. The City argued that Randel failed to establish that the City waived its sovereign immunity. The City argued that KCPD officers are not the City's agents and that the acts or omissions of KCPD officers could not establish the City's exercise of exclusive control and possession of the roadway as a matter of law. The City also argued that the accident occurred on a

---

trial court in its judgment, the caption of which designates the City as the lone defendant. We conclude that the judgment from which the City appeals was final for the purpose of appeal, which alleviates the concerns present in *KAS Enterprises, Inc. v. City of St. Louis*, 121 S.W.3d 262 (Mo. App. E.D. 2003).

[3] All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

state highway and that, pursuant to the Missouri Constitution and state statutes, the Commission has jurisdiction and control over state highways to the exclusion of any other public entity. The trial court denied the City's motion for directed verdict. The City proceeded with its evidence. At the close of all of the evidence, the City renewed its motion for directed verdict. The trial court again denied the motion.

Randel's case was submitted to the jury with a verdict director that required the jury to find that at the time of Randel's accident, the City exercised "exclusive control and possession" of the roadway where Randel's accident occurred; that the hydraulic fluid in the roadway was not reasonably safe; that the City knew or could have known of the condition but failed to use ordinary care to timely warn about the condition; and that Randel was injured as a result. On the element of "exclusive control and possession," Randel's counsel emphasized in closing that though the property in question was owned by the State, "[t]he police came and sent MoDOT home." Randel argued that in doing so, the City assumed exclusive control and possession of the State's property, and that "it's [not] MoDOT's fault for listening to the City when they came and took control of the scene." The jury returned a verdict in favor of Randel and assessed damages at $499,080. The trial court entered a judgment in accordance with the jury's verdict.

The City filed several post-trial motions, including a motion for judgment notwithstanding the verdict that, among other things, repeated the arguments made in the City's motions for directed verdict. The trial court denied the City's post-trial motions.

The City appeals.

4

## Analysis

Although the City raises four points on appeal, its first point is dispositive.[4] The City claims that the trial court erred in denying its motion for directed verdict at the close of the evidence because Randel failed to prove that the City owned or had exclusive control and possession over the roadway where Randel's accident occurred and thus failed to prove that the City waived sovereign immunity pursuant to section 537.600.1(2).[5] We agree.

We review the denial of a motion for a directed verdict *de novo* to determine whether a submissible case was made. *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. banc 2014). "A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence." *Id.* In making that determination, "we view the evidence and all reasonable inferences from it in the light most favorable to the plaintiff and disregard all contrary evidence." *Kerr v. Vatterott Educ. Ctrs., Inc.*, 439 S.W.3d 802, 809 (Mo. App. W.D. 2014). If at least one element of the plaintiff's case is

---

[4]In addition to its first point on appeal, the City argues: (i) that the trial court erred in failing to grant a new trial because the jury instructions permitted a roving commission to determine whether the roadway was the City's property and in a dangerous condition; (ii) that the trial court erred in failing to reduce the judgment to reflect Randel's settlement with the Commission; and (iii) that the trial court abused its discretion in refusing to sanction Randel's counsel for taking inconsistent positions about whether the City and the Commission were joint tortfeasors, an argument that relates to the City's claim that the judgment should have been reduced by the settlement between Randel and the Commission. Because the City's first point on appeal is dispositive, the remaining points on appeal are rendered moot and need not be discussed.

[5]The City advanced three specific arguments in support of this contention: (i) that KCPD officers are not agents of the City, and as a result, their acts or omissions cannot constitute the City's exercise of exclusive possession and control of *any* roadway; (ii) that even if KCPD officers are agents of the City, the officers were not exercising exclusive possession and control of the entrance ramp because MoDOT was also exercising possession and control of the entrance ramp; and (iii) that pursuant to the Missouri Constitution and state statutes, the Commission exercises exclusive jurisdiction and control over the state highway system to the exclusion of any other public entity as a matter of law. Because we generally conclude that Randel failed to establish that the City had the requisite ownership of, or exclusive control or possession over, the property in question, we need not further address these specific arguments.

not supported by the evidence, then a directed verdict is appropriate, and we will reverse. *Ellison*, 437 S.W.3d at 768.

Sovereign immunity protects government entities from tort liability. *Benson v. Kansas City Bd. of Police Comm'rs*, 366 S.W.3d 120, 124 (Mo. App. W.D. 2012). Section 537.600.1 provides: "Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect . . . ." The statute describes two exceptions to sovereign immunity, one of which is applicable to this case. Sovereign immunity is waived for:

> Injuries caused by the condition of ***a public entity's property*** if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that ***either*** *a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition* ***or*** *a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.*

Section 537.600.1(2) (emphasis added). As the plaintiff, Randel bore the burden to plead and prove the City's waiver of sovereign immunity. *Maune ex rel. Maune v. City of Rolla*, 203 S.W.3d 802, 804 (Mo. App. S.D. 2006).

Here, the "dangerous condition" about which Randel complains is the presence of hydraulic fluid on the roadway. It is uncontested that this "dangerous condition" existed and contributed to cause Randel's injuries. It is uncontested that the property where the spill and the accident occurred is a part of the state highway system and is thus property

6

owned by the Commission and not the City. It is also uncontested that it was a MoDOT employee, and not a City employee, who created the dangerous condition. Randel nonetheless argues that the City was "*a* public entity [with] actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Emphasis added.) If we assume, *arguendo*, and without deciding, that KCPD's knowledge of the spill is chargeable to the City, then it is hard to argue that the City was not "*a* public entity" with notice of the spill in time to take measures to protect against the spill prior to Randel's accident.

However, our courts have construed the phrase "a public entity" in this context, and have held that the phrase "a public entity" is not different from "the public entity" otherwise referred to throughout section 537.600.1(2). In *Claspill v. State Division of Economic Development*, 809 S.W.2d 87, 88 (Mo. App. W.D. 1991), a plaintiff sued a public entity claiming the public entity's employees contributed to cause a dangerous condition on property owned by another public entity. On appeal from dismissal based on sovereign immunity, the plaintiff argued that under section 537.600.1(2), "it is not necessary that the dangerous condition of land created by a public entity's employees be owned or occupied by the same public entity as that for which the negligent employees are employed. . . . [S]uch land may be occupied by *any* public entity." *Id.* This Court disagreed and held that "the legislature was grammatically correct in its use of 'a' and 'the' and that the public entity mentioned in [section 537.600.1(2)] *remains the same public entity throughout*." *Id.* at 89 (emphasis added). Thus, the public entity whose employees create a dangerous condition or fail to protect from a dangerous condition

7

must be the same public entity referred to by the phrase "a public entity's property," and thus the same public entity on whose property the dangerous condition exists. *Id.*

As such, the threshold question which must first be addressed when a public entity is sued for injuries resulting from a dangerous condition on property is whether the property is the public entity's property. *Summitt v. Roberts*, 903 S.W.2d 631, 635 (Mo. App. W.D. 1995) (claim "fails on a threshold question" because property where plaintiff was injured "belongs to neither" public entity); *see also Spielvogel v. City of Kansas City*, 302 S.W.3d 108, 112 (Mo. App. W.D. 2009); *Thomas v. Clay Cnty. Elec. Bd.*, 261 S.W.3d 574, 578-80 (Mo. App. W.D. 2008).

The phrase "a public entity's property" plainly includes property owned by a public entity. *Claspill*, 809 S.W.2d at 89 (holding that "a public entity's property" refers to the public entity that "owns" the property where a dangerous condition exists); *Dorlon v. City of Springfield*, 843 S.W.2d 934, 938 (Mo. App. S.D. 1992) (holding that "[i]njuries caused by the condition of a public entity's property . . . , clearly refers to ownership of a property interest which allows a public entity to control the property"). Here, as we have already noted, the uncontested evidence established that the Commission owns the property where Randel's accident occurred. Thus, the property was not the City's property pursuant to section 537.600.1(2) on the basis of "ownership."

Randel concedes this point. Randel argues, however, that "a public entity's property" also includes property a public entity does not own, but as to which the public entity exercises "exclusive control and possession." Missouri cases do indeed hold that where a public entity exercises "exclusive control and possession" over property, the

8

property will be viewed as "a public entity's property" for purposes of section 537.600.1(2). However, this precedent actually demonstrates that Randel's evidence was insufficient to establish that the City had "exclusive control and possession" of the Commission's property.

In *James v. Farrington*, 844 S.W.2d 517, 517-18 (Mo. App. W.D. 1992), a county election board rented a privately owned church for use as a polling place pursuant to a written contract. A voter was injured inside the polling place during the time the election board had possession of the premises. *Id.* at 518. The question framed was whether "a church that rented space to an election board as a polling place constitutes a public entity's property." *Id.* Noting that "[s]ection 115.117, RSMo permits an election authority to 'contract for the rental of a suitable polling place,'" and that "[s]ection 115.409, RSMo states that only election authority personnel, election judges, watchers and challengers or law enforcement officials at the request of election officials who were in the line of duty, and registered voters 'shall be admitted to the polling place,'" this Court concluded that:

> Not only statutorily but by necessity the Board must have the ability to control the voting area and the entrance and exit to the actual point of voting. Therefore, *the Board had both the statutory authority and the actual ability to monitor the polling place, exclude unauthorized persons and generally, exercise control* over the [church] and the entrance, during the election proceedings.

*Id.* at 519-20 (emphasis added). This Court then explored whether "control" of this nature, *created by a written contract authorized by statute*, falls within the intended

9

meaning of the phrase "a public entity's property" as used in section 537.600.1(2). *Id.* at 520. This Court held:

> A determination that the Board had possession or control of the polling place does not end the inquiry for purposes of establishing an exception to sovereign immunity. Defendants assert that the "public entity's property" should be narrowly construed to include only that property which is *owned* by a public entity, regardless of the control it may exert over such property. Our research has not found any Missouri cases which have considered whether the public entity must hold fee simple title in the property in order for this exception to apply. Even though strict construction of statutory provisions waiving sovereign immunity is required, it is also true that words in statutes are to be considered in their plain and ordinary meaning in order to ascertain the intent of the lawmakers. The statute refers to "a public entity's property" and the definition of property suggests more than a fee simple ownership. *Webster's New Collegiate Dictionary* defines property as "something owned or possessed."
>
> Under the facts of the present case, a definition of the term "public entity's property" includes the exclusive control and possession of a polling place.

*Id.* (citations omitted); *see also Tillison v. Boyer*, 939 S.W.2d 471, 473 (Mo. App. E.D. 1996) (holding that property of a public entity "includes having exclusive control and possession of . . . property").

Following *Farrington*, our courts have explored the contours of "exclusive control and possession" on several occasions. In *Rell v. Burlington Northern Railroad Co.*, the Eastern District held that a county had not waived its sovereign immunity in connection with an alleged dangerous condition "at" or "near" the intersection of a county road with privately owned railroad tracks. 976 S.W.2d 518, 522 (Mo. App. E.D. 1998), *abrogated on other grounds*, *Joel Bianco Kawasaki Plus v. Meramec Valley Bank*, 81 S.W.3d 528 (Mo. banc 2002). The Court affirmed dismissal of the claim against the county noting:

10

> Whatever County's interest in the railroad crossing, it cannot be said that it was one under which County enjoyed exclusive control and possession. Indeed, Driver acknowledged in his Petition that the railroad tracks and easement property adjacent thereto belonged to Railroad, not County. Therefore, County is immune from liability for any dangerous condition alleged to exist "at" the intersection of a county road and the privately controlled railroad tracks or for their failure to warn thereof.

*Id.* at 521-22. In short, the county's mere ability to warn about, or to otherwise take action to protect from, a dangerous condition on privately owned property did not constitute "exclusive control and possession" for purposes of waiver of sovereign immunity. *Id.* at 521.

In *State ex rel. Division of Motor Carrier & Railroad Safety v. Russell*, 91 S.W.3d 612, 614-15 (Mo. banc 2002), a state agency "created for the purpose of administering regulatory and supervisory powers relating to transportation activities, specifically the supervision and maintenance of railroad crossings," sought a writ of prohibition to prevent pursuit of a wrongful death lawsuit arising out of a death at a privately owned railroad crossing. The Supreme Court made its preliminary writ absolute, and its holding is instructive:

> It is . . . uncontested that the relator does not own the road, crossing, tracks, or transmission lines at the [railroad] crossing. The controlling issue is the question of whether the railroad crossing . . . can be considered "property" of the relator for the purposes of waiving sovereign immunity despite the fact that it does not own the property.

> If the crossing is not "property" of the relator, then it cannot be subject to suit under the dangerous condition waiver. If the crossing is considered the "property" of the relator, the relator is still not liable for failure to perform an intangible act. Failure to perform an intangible act, whether it be failure to supervise or warn cannot constitute a dangerous "condition" of the "property" for purposes of waiving sovereign immunity. A physical defect

11

in the sovereign's property and injuries directly stemming from that defect will subject the sovereign to tort liability.

For a dangerous condition waiver of sovereign immunity to apply, the dangerous condition must "describe, define, explain, denote or reference only and exclusively the physical defects in, upon and/or attending to property of the public entity." ***In order for property to be considered that of the sovereign for the purpose of waiver [of] immunity under section 537.900.2 [sic], the sovereign must have exclusive control and possession of that property. Privately owned property that is merely regulated by a government agency or entity is not "public property" and, accordingly, is not within the statutory exception to sovereign immunity***.

The relator does not own, nor have exclusive control or possession of the . . . railroad crossing. It acts in a supervisory or regulatory role over the crossing, as it does each of the state's railroad crossings, with the purpose of ensuring that all crossings are safe. Accordingly, the unfortunate accident that occurred at this individual crossing, which is not owned, controlled, or possessed by the relator does not subject it to suit under the dangerous condition waiver of sovereign immunity.

*Id.* at 616 (emphasis added) (citations omitted).

Finally, in *Thomas v. Clay County Election Board*, this Court reversed the grant of summary judgment in favor of a county election board which rented private property for an election because the trial court did not apply the correct legal test for waiver of sovereign immunity. 261 S.W.3d at 580. This Court held that "[t]he appropriate question is whether the Board exercised possession and control *rising to the level of an ownership interest* over the area where [the plaintiff] fell." *Id.*

Collectively read, although the aforesaid precedent recognizes that a public entity's control and possession of *privately* owned property can rise to the functional equivalent of ownership as to constitute "a public entity's property" under section 537.600.1(2), the factual scenarios supporting the finding are narrow.

12

In fact, proof that a public entity exercised "exclusive control and possession" over property owned by another **public** entity is arguably even more difficult to establish. In *Claspill*, the court concluded that a public entity alleged to have some ability to control, but that does not own, another public entity's property has not waived sovereign immunity. 809 S.W.2d at 89. "[T]he legislature did not so broadly expand the waiver of sovereign immunity so as to make all public entitles liable for conditions on other public entities' lands over which they have some control." *Id.*

In *Dorlon*, the Southern District found a city had waived sovereign immunity for a dangerous condition on a sidewalk it owned, but the board of regents for a university which held a possible reversionary interest in the property had not. 843 S.W.2d at 939.

> Maintenance of a sidewalk dedicated to the City is not an activity required to be carried out by the Regents. That duty is expressly delegated to the City after dedication and acceptance of the property is complete. The City concedes "[t]he general rule is that the municipality has a nondelegable duty to maintain the improved public right-of-way as a result of accepting the dedication to the public of the right-of-way.
>
> Section 82.190, RSMo 1986, vests the City with "exclusive control over its public highways, streets, avenues, alleys and public places," and the City does not dispute its authority to control the sidewalk in question. The Regents have no right or obligation to control or maintain the sidewalk regardless of their reversionary property interests.

*Id.* at 938-39 (citation omitted).

In *Summitt*, a student was struck by a car while crossing a state highway adjacent to a school. 903 S.W.2d at 633. The student sued the Commission, the City of Grain Valley, and the School District. *Id.* Her petition acknowledged that the highway was a state highway owned by the Commission, but she alleged that the city and the school

13

district also "jointly possessed" that portion of the state highway running through the city limits and in front of the school and thus waived sovereign immunity for the dangerous condition of the roadway given the absence of a crosswalk or appropriate signage. *Id.* at 633-35. This Court affirmed summary judgment in favor of the city and the school district on the basis of sovereign immunity, noting that "[n]either the School District nor the City had exclusive control or possession of the property at issue, AA Highway, [sic] the [Commission] does." *Id.* at 635. Thus, the plaintiff's assertion "that the property was also jointly possessed by the City and the School District in addition to the [Commission] is simply not tenable."[6] *Id.* In reaching this conclusion, this Court cited to section 227.210 which provided at the time that:

> The state highways as designated in section 227.020 shall be under the jurisdiction and control of the commission . . . .

*Id.* It also noted that "section 227.030.1 provides that construction and maintenance of the highway system, and all work incidental to that system, is under the general supervision and control of the [Commission]." *Id.*

*Summitt* relied heavily on *Crofton v. Kansas City*, 660 S.W.2d 709 (Mo. App. W.D. 1983). *Crofton* explored the effect of Chapter 227 on the legal obligation owed by a public entity other than the Commission over property that is a part of a state highway system. In *Crofton*, this Court held that the effect of the combination of provisions of the

---

[6]Randel has not argued that "a public entity's property" as used in section 537.600.1(2) should be construed to permit two public entities (the one who owns the property and another with an argued right or opportunity to control and possess the property) to waive sovereign immunity and thus to bear joint responsibility for the same accident or injury. Randel has only argued that they City assumed "exclusive control and possession" of the property where Randel was injured to the exclusion of the Commission.

Missouri Constitution[7] and state statutes addressing the state highway system and the

authority and jurisdiction of the Commission "was to abolish local responsibility for state

highways and vest that responsibility in the State Highway Commission." 660 S.W.2d at

713. *Summitt*'s discussion of *Crofton* is instructive:

> In *Crofton* the issue was whether the City of Kansas City owed a duty of
> care to plaintiffs who were injured as a result of an automobile accident on
> U.S. Highway 50 where the evidence established that at the time of the
> accident U.S. 50 was built, owned and maintained by the MHTC. [660
> S.W.2d at 710.] Plaintiffs argued that the city had joint or mutual control
> over the state highway. The court found that the city owed no duty to
> plaintiffs, reasoning that even if the city claimed power and authority over
> the section of U.S. 50 in question the city would be wrong because,
> "[a]ppellant-city has no authority or power to vest itself with any powers or
> authority not granted to it by the state." *Id.* at 717.

903 S.W.2d at 635.

In *Ford v. Cedar County*, 216 S.W.3d 167, 168 (Mo. App. S.D. 2006), a

motorcyclist was fatally injured when he lost control of his motorcycle on a county road

and left the roadway. The survivors filed a wrongful death action against the county. *Id.*

They alleged that the county failed to warn of the dangerous condition of the road and

failed to post a speed limit sign in the area of the accident. *Id.* at 169. On appeal, the

Southern District affirmed the grant of summary judgment on the basis of sovereign

---

[7] Article IV, section 29 of the Missouri Constitution provides, in pertinent part, as follows:

The highways and transportation commission shall be in charge of the department of
transportation. . . . The highways and transportation commission (i) shall have authority over the
state highway system; (ii) shall have authority over all other transportation programs and facilities
as provided by law, including, but not limited to, aviation, railroads, mass transportation, ports,
and waterborne commerce; and (iii) shall have authority to limit access to, from and across state
highways and other transportation facilities where the public interests and safety may require. All
references to the highway commission and the department of highways in this constitution and in
the statutes shall mean the highways and transportation commission and the department of
transportation.

15

immunity because a special road district created and authorized by state statute had exclusive jurisdiction and control over the roadway where the accident occurred. *Id.* at 171. The court held that "[a] public entity cannot be subject to suit for a dangerous condition which exists on property under the control of another public entity."[8] *Id.*

Similarly, in *Vonder Haar v. Six Flags Theme Parks, Inc.*, 261 S.W.3d 680, 683 (Mo. App. E.D. 2008), a passenger was injured and his family was killed in a car accident on Interstate 44 while traveling to a theme park. Evidence showed that traffic congestion was common at the Interstate 44 exit ramp leading to the theme park, and on the day of the accident, traffic was backed up onto Interstate 44. *Id.* at 683-84. Nearly a mile before the exit ramp, the car carrying the passenger and his family collided with a car stopped in front of them and careened into moving traffic before being broadsided by a tractor trailer. *Id.* at 683. The accident took place within the city limits of Eureka, and the city was using its police officers to direct traffic on the exit ramp at the time of the accident. *Id.* at 688. The passenger sued the city of Eureka for personal injuries and wrongful death. *Id.* at 684. Eureka was granted summary judgment on the basis of sovereign immunity. *Id.* On appeal, the passenger contended "that [the Commission's] ownership and control of the roadways do not preclude application of the waiver [pursuant to section 537.600.1(2)] against Eureka *because the city still maintained sufficient control to take precautionary measures*, such as the use of city police to direct

---

[8]The court did note that Ford failed to properly respond to the County's motion for summary judgment and that the affidavits and exhibits upon which Ford wished to rely to establish the County's control over the location where the accident occurred were thus not properly before the court. *Ford*, 216 S.W.3d at 171-72. Thus, we do not read *Ford* to hold that, as a matter of law, a public entity can never be subject to suit for a dangerous condition which exists on property owned by another public entity. *See, e.g., Phelps v. City of Kansas City*, 371 S.W.3d 909, 916-20 (Mo. App. W.D. 2012).

16

traffic at the intersections." *Id.* at 688 (emphasis added). The Eastern District disagreed. "'Our state constitution and statutes vest exclusive control, dominion, power, and jurisdiction over [the state highways] in the [Commission].'" *Id.* (quoting *Crofton*, 660 S.W.2d at 717; citing MO. CONST. art. IV, sections 29, 31; sections 227.030, 227.210).

We are not suggesting that a public entity can never "exclusively control and possess" property that is owned by another public entity. However, because ownership already renders property "a public entity's property" for purposes of waiver of sovereign immunity under section 537.600.1(2), our cases do suggest that the evidence required to establish that a public entity has assumed "exclusive control and possession" over property to the exclusion of the public entity owner will be necessarily demanding.

On this point, it is worthy of note that the State is afforded the Constitutional authority to delegate maintenance duties to a municipality by contract. Article IV, section 31 of the Missouri Constitution provides, in relevant part:

> The commission may enter into contracts with cities, counties or other political subdivisions for and concerning the maintenance of, and regulation of traffic on any state highway within such cities, counties or subdivision.

Such a maintenance contract may be used to establish that the State has relinquished its duties and obligations over state highways to another public entity. *Crofton*, 660 S.W.2d at 717 (holding that "[o]ur state constitution and statutes . . . vest exclusive control, dominion, power, and jurisdiction over [state highways] in the [Commission]," and observing that "***no maintenance agreement between appellant-city and the [Commission]*** which permissibly would create an exception to the duty of the [Commission], and which would place a non-delegable duty on appellant-city" had been

17

entered). A maintenance agreement of the nature authorized by Article IV, section 31 of the Missouri Constitution would be highly analogous to the lease agreement authorized by statute in *Farrington*.

Here, Randel's evidence established only that KCPD[9] responded to the scene of the dangerous condition created by Commission employees on the Commission's property and told the MoDOT workers who caused the dangerous condition that they could leave. At best, Randel's evidence established that KCPD had the opportunity to regulate traffic in the area of the dangerous condition created by the Commission, and thus an opportunity to warn Randel of the hazard which caused her accident. This evidence does not, however, rise to the factual circumstances envisioned by *Farmington*, *Rell*, and *State ex rel. Div. of Motor Carrier* as essential to establishing "exclusive control and possession." And the opportunity to warn or to prevent injury is indistinguishable from the factual circumstances involved in *Claspill*, *Dorlon*, *Summit*, *Ford*, and *Vonder Haar*, where a waiver of sovereign immunity based on "exclusive control and possession" was not established.

In summary, though KCPD may have failed to take reasonable actions to protect from the dangerous condition on the Commission's property, the property was neither owned by the City nor under the "exclusive control and possession" of the City. Thus, KCPD's acts or omissions, even if chargeable to the City (a point in contention we need

---

[9]As previously noted, we acknowledge, but need not address, that the City vehemently contests attribution of KCPD conduct to it as the City argues that KCPD personnel are not the City's agents. We do not intend by our discussion of Randel's evidence to presume a resolution of this contested issue. Because we otherwise conclude that Randel did not make a submissible case of waiver of sovereign immunity, the issue of agency is one we simply need not resolve.

not resolve), are protected by sovereign immunity. As evidenced by the verdict director tendered by Randel to the jury, the acts or omissions are in the nature of a failure to warn, acts that cannot waive sovereign immunity with respect to a dangerous condition on property unless it can be established, as a threshold matter, that the property was owned by the City or exclusively controlled and possessed by the City as to rise to the level of an ownership interest supplanting the ownership interest of the Commission in the property. *State ex rel. Div. of Motor Carrier*, 91 S.W.3d at 616 (holding that if property "is not 'property' of the [public entity], then [the public entity] cannot be subject to suit under the dangerous condition waiver").

Because Randel's evidence did not establish that the City owned or assumed "exclusive control and possession" of the property where Randel's accident occurred, the trial court erred in failing to grant the City's motion for directed verdict at the close of the evidence on the basis of sovereign immunity. *See Ellison*, 437 S.W.3d at 768.

## Conclusion

The trial court's judgment in favor of Randel and against the City is reversed. We exercise our authority pursuant to Rule 84.14 to "give such judgment as the court ought to give," and enter judgment in favor of the City and against Randel.

_Cynthia L. Martin_
Cynthia L. Martin, Judge


All concur

19